# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOHN DOE,
      Plaintiff,

vs.

DENISA BASSETT, et al.,
      Defendants.

Case No. 1:18-cv-508
Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

     This matter is before the Court on plaintiff John Doe's motion for a temporary restraining order ("TRO") (Doc. 2) and defendants' response in opposition (Doc. 9). The Court held an evidentiary hearing in this matter on December 17, 2018. The parties submitted post-hearing briefs on December 31, 2018. (Docs. 25, 26). Plaintiff submitted a supplemental brief on the issue of standing on January 18, 2019. (Doc. 28). For the reasons stated below, the Court recommends that plaintiff's TRO motion be **DENIED**.

## I. Findings of Fact

     Plaintiff John Doe is a fifty-year-old husband and father to a fourteen-year-old son. (Declaration of John Doe, Doc. 2-1 at ¶ 1; Transcript of Proceedings, Doc. 24 at 13). He has been married to his wife for twenty-six years. (*Id.*). Plaintiff is a former high school teacher and intervention specialist who taught students with behavioral challenges and special education needs. (Doe Declaration at ¶ 2). In 2014, plaintiff pled guilty to two counts of gross sexual imposition for offenses involving an eighteen-year-old female student ("the underlying

offense"). (*Id.*).[1] He was subsequently sentenced to three years in prison, five years post-release control ("PRC"), and fifteen years of sex offender registration. (*Id.* at ¶ 4). He has no other criminal history. (*Id.* at ¶ 3). The special conditions of plaintiff's PRC form the basis for his request for a TRO.

## A. Plaintiff's Employment as a School Intervention Specialist

As an intervention specialist, plaintiff worked with students in a classroom setting who had mild disabilities and individual education plans ("IEPs"). (Transcript at 14-15). In March 2012, the eighteen-year-old female student ("the victim") began receiving individualized classroom instruction from Mr. Doe and his student teacher. (*Id.* at 16-17).

During the 2012-2013 school year, plaintiff taught the victim algebra, government and economics, and environmental science. (*Id.* at 17). Beginning in December 2012, plaintiff also coached the chess club in which the victim was a member and also gave the victim rides home after practice. (*Id.* at 18-19). In October 2012, the victim and her cousin completed yard work for plaintiff. (*Id.*). In exchange for the work, plaintiff took the victim and her cousin to the Kings Island amusement park and gave them money to spend at the park. (*Id.*). At the end of the 2012-2013 school year, the victim's grandmother warned plaintiff that the victim had developed a crush on him. (*Id.* at 44). However, plaintiff "just didn't see it." (*Id.*).

During the 2013-2014 school year, in agreement with the victim's grandmother, plaintiff drove the victim and her cousin to school to keep them from being tardy. (*Id.* at 19-21). The

---

[1] Ohio Rev. Code § 2907.05(A)(5) provides in relevant part:

> No person shall have sexual contact with another . . . when . . . [t]he ability of the other person to resist or consent or the ability of one of the other persons to resist or consent is substantially impaired because of a mental or physical condition . . . and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person . . . is substantially impaired because of a mental or physical condition. . . .

victim was no longer in plaintiff's classes, but she used plaintiff's classroom computer to complete assignments during her study period. (*Id.* at 21, 47). During the school year, plaintiff also transported the victim home from a football game, to a chess tournament, and, along with another student, to a prom dress fitting. (*Id.* at 20-22). By March 2014, plaintiff stopped giving the victim and her cousin rides to school due to baseball coaching obligations. (*Id.* at 46).

### B. Plaintiff's Underlying Offense

In April 2014, the victim communicated to plaintiff that she wanted to have a relationship with him, and plaintiff reciprocated interest. (*Id.* at 23, 48). Plaintiff told the victim, "we have to be very careful." (*Id.* at 48). Thereafter, on May 22, 2014, plaintiff drove the victim and her cousin to the senior graduation picnic. (*Id.* at 23). Plaintiff and the victim planned to talk about their relationship after the picnic. (*Id.* at 49). Plaintiff had previously given the victim his cell phone number. (*Id.* at 49-50). Around 2:00 P.M. that day, the victim came to plaintiff's classroom. (*Id.* at 23). Plaintiff and the victim then went into a large maintenance room and kissed and engaged in sexual acts, including cunnilingus and fellatio.[2] (*Id.* at 24). Following the victim's graduation in May 2014, plaintiff, the victim, the victim's cousin, and another student visited Kings Island. (*Id.* at 54). Plaintiff paid for the tickets. (*Id.*). Plaintiff and the victim left the park and engaged in sexual intercourse in plaintiff's marital home while no one else was home. (*Id.* at 25). During plaintiff's overseas trip in the summer of 2014, he and the victim communicated over social media and plaintiff sexted the victim a picture of his genitalia. (*Id.* at 26).

The victim had a reported IQ score of 70. (*Id.* at 57, 59). Ms. Susan Ullman, plaintiff's qualified expert in sex offenders and sex offender risk assessments, questioned the accuracy of

---

[2] The victim was eighteen years old at the time of the offense. (Doe Testimony at 14).

the victim's IQ score based on the lack of information about the person who performed the IQ test and whether the IQ accounted for the student's full-scale score or her highest or lowest score. (Transcript at 92). Ms. Ullman also testified that the score was contradictory to the victim's other achievements, such as an ACT score reflective of the average Cincinnati Public School student and being chairman of the high school chess team where she participated in tournaments and won several trophies. (*Id.* at 92-93). The victim also suffered from post-traumatic stress disorder, reactive attachment disorder, cognitive and memory issues, impaired judgment, and a history of sexual abuse. (Transcript at 57-58). Plaintiff testified that he was "shocked" to learn of her IQ score of 70 and believed that she was an "incredibly capable young woman." (*Id.*).

### C. Plaintiff's Arrest, Conviction, and Incarceration

Plaintiff accepted responsibility for the underlying offense and pled guilty to two counts of gross sexual imposition. (*Id.* at 26). Plaintiff was sentenced to three consecutive years in prison. (*Id.*). His attempt to appeal the trial judge's decision to run his sentences consecutively failed. (*Id.*).

While incarcerated, plaintiff's wife and fourteen-year-old son regularly visited him and corresponded by cards and letters. (*Id.* at 28-30; Doe Declaration at ¶¶ 8-9; Plaintiff's Exhibit 2, A-F). He also talked to his wife and son on the phone every day. (Transcript at 29).

While incarcerated, plaintiff received a Sex Offender Risk Reduction Center ("SORRC") level of zero, which is the lowest on a scale of zero to five. (Doe Declaration at ¶ 5). Unlike other sex offenders, plaintiff had a low recidivism risk and was not required to complete comprehensive programming. (*Id.*).

4

**D. Plaintiff's Release from Prison and Post-Release Control Conditions**

Near the end of his prison sentence, in September 2017, plaintiff informed the Adult

Parole Authority ("APA") that he intended to return to his home to live with his wife and son.

(Transcript at 32; Doe Declaration at ¶ 11). The APA informed plaintiff that the presence of his

minor-aged son prevented him from living at the family home. (Doe Declaration at ¶ 12). The

APA also informed plaintiff he could have "no contact" with minors without APA approval.

(Transcript at 32; Doe Declaration at ¶ 13). Plaintiff inquired about contact with his son and was

told that his parole officer would address the issue once he was released from prison. (Doe

Declaration at ¶ 13).

On December 10, 2017, plaintiff was released from prison. (*Id.* at ¶ 14). Soon thereafter,

plaintiff met with defendant Parole Officer Bassett for the first time and signed paperwork[3] and

reviewed the conditions of PRC with her. (Transcript at 146; Doe Declaration at ¶ 15).

Defendant Bassett initially advised plaintiff that he could not have any contact with his son,

including by phone, mail, or email. (Transcript at 68; Doe Declaration at ¶ 15). Plaintiff could

not keep photographs of his son. (Doe Declaration at ¶ 15). Defendant Bassett told plaintiff that

she would talk to the sex offender specialist, Richard Brooks, about the process of obtaining

APA approval to see his son. (Transcript at 153-55; Doe Declaration at ¶ 15). At the next

meeting in January 2018, defendant Bassett had no further information on the process of

applying for supervision. (Doe Declaration at ¶ 17). On March 30, 2018, defendant Bassett

wrote in her field officer notes that she spoke with plaintiff about contacting his wife, his son's

mother, to gather information about speaking with and contacting his son. (Transcript at 156;

Defendants' Exhibit 1 at 4). Defendant Bassett tried to call plaintiff's wife several times, but she

---

[3] Plaintiff signed a conditions of supervision form, a release of information form, and a grievance form. (Bassett Testimony at 147).

never called back. (*Id.* at 157). On May 25, 2018, defendant Bassett wrote in her notes that she spoke with plaintiff concerning contact with his son and "his son's mother do [sic] not want to deal with the situation." (*Id.*).

Most recently, in August 2018, plaintiff's wife was approved by the APA to be a supervising adult to monitor visits between plaintiff and his son. (Transcript at 161). Each time plaintiff wants to visit his son, he must make a request for visitation with Parole Officer Bassett, who then must hold a meeting with and receive approval from Mr. Brooks, the sex offender specialist. (*Id.* at 161-62). Defendant Bassett testified that the process of approval may take "a day" or "a couple days." (*Id.* at 162). Since his release from prison, plaintiff has spent a total of 12 hours of supervised contact with his son. (*Id.* at 33-34).

Plaintiff remains unable to live at or visit the family home. (Doe Declaration at ¶¶ 20-21). Thus, he maintains a separate residence from his wife and son. (*Id.* at ¶ 22). The arrangement has strained his marriage because he is limited in his ability to help raise their son. (*Id.* at ¶¶ 22-23). Plaintiff has complied with PRC conditions since his release from prison. (*Id.* at ¶ 24).

The APA Sex Offender Supervision Policy provides that sex offenders "who have been restricted from family contact due to the nature of their offenses may have those restrictions reviewed, and under certain circumstances, revised." (Plaintiff's Exhibit 4 at 11) ("reunification process"). In cases involving a "no unsupervised contact with minors" condition, the condition cannot be removed without the Parole Board's approval. (*Id.*). A sex offender may seek approval from the Parole Board to remove the condition after satisfying seven conditions:

1. The offender successfully completes sex offender programming (if required);

2. The offender's family is willing to proceed with revised restrictions;

3. The offender has been on supervision for at least one (1) year;

4. The offender's risk score is moderate-low or lower on the Static 99-R;

5. There has been no violation involving high risk sexual activity within the past twelve (12) months.

6. Removal of the condition has been staffed with the sex offender specialist.

7. There has been consultation with the Office of Victim Services (OVS) to obtain any additional information that shall be considered prior to approving revised restrictions.

(*Id.*). Mr. Brooks testified that he has not seen the family reunification process take less than seven months after the requisite one year of supervision. (Transcript at 202). Mr. Brooks testified that there is "no time frame in the policy, and it is up to the individual therapist." He has seen the process take over a year after the requisite one year of supervision. (*Id.*). Ms. Brigid Slaton, Chief Hearing Officer for the State of Ohio Department of Corrections in the Cincinnati region, testified that once the removal of the condition has been staffed with the parole officer and the sex offender specialist, the consultation with the Office of Victims Services will not take long, depending on the work volume, because the office is "very responsive." (*Id.* at 260).

Based on these facts, plaintiff seeks a temporary restraining order enjoining defendants from enforcing the no unsupervised contact with minors condition as applied to his son and allowing him to reside with his wife and son in their family home. (Doc. 2).

## II. Standard of Review

Federal Rule of Civil Procedure 65 governs the proper procedures and requirements for the issuance of injunctions and temporary restraining orders. The purpose of a TRO is "to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). The same standard generally

applies to temporary restraining orders and preliminary injunctions. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008); *Northeast Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

In determining whether to grant or deny emergency injunctive relief, the Court must consider four factors: (1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of an injunction. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). "These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together." *Northeast Ohio Coal. for Homeless*, 467 F.3d at 1010 (quoting *Mich. Coal of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). A TRO is an "extraordinary and drastic remedy" and should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848-49 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

## III. Analysis

### A. Standing

Before addressing the merits of plaintiff's request for a TRO, the Court must first address defendants' argument that plaintiff lacks standing because he has failed to establish that any of the named defendants have the power to remove the PRC condition to which he objects. (Doc.

25 at 33-37). Defendants argue that plaintiff has failed to establish the second and third requirements of Article III standing—traceability and redressability. (Doc. 25 at 34-35). Defendants argue that defendants Bassett, Thomas, and Williams did not impose the PRC condition, nor do they have the power to remove the condition. (*Id.* at 35). Defendants also argue that plaintiff seeks to hold defendants Thomas and Williams liable as supervisory officials. (*Id.* at 36).

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'cases' and controversies,' and 'Article III standing . . . enforces the Constitution's case-or-controversy requirement.'" *Doe v. DeWine*, 910 F.3d 842, 849 (6th Cir. 2018) (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007) (in turn citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). To establish Article III standing, a party must meet three requirements. *Id.* "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

Plaintiff has satisfied the traceability and redressability prongs of Article III standing for purposes of the Court's resolution of the present TRO motion. Plaintiff has alleged that all three defendants are responsible for enforcing the alleged unconstitutional PRC condition that presently prevents him from having any unsupervised contact with his son. (Doc. 28 at 4).

Thus, plaintiff's injury is traceable to these defendants by virtue of their enforcement of the condition. (*Id.*). Plaintiff has alleged that all three defendants have the ability to redress his injury by removing the condition as applied to contact with his son. (*Id.*). "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015). If plaintiff prevails, it is likely that the requested relief—non-enforcement of the PRC condition as applied to plaintiff's son—can be redressed by defendants Bassett, Thomas, and Williams. If plaintiff prevails, in addition to striking the PRC condition as unconstitutional, the Court could order these defendants to cease enforcement of the condition as applied to plaintiff's contact with his son. *See DeWine*, 910 F.3d at 851 (noting that "[t]he power of the federal courts to remedy constitutional violations is flexible. . . [and] [w]here such a violation has been found, the court should tailor the remedy to fit the nature and extent of the violation") (quoting *U.S. v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1235 (2d Cir. 1987)). Accordingly, plaintiff has demonstrated a justiciable case or controversy.[4]

## B. Likelihood of Success on the Merits

Plaintiff must first prove that his claims have a strong likelihood of success on the merits. While plaintiff is not required to prove his entire case at this juncture, "to establish success on the merits, a plaintiff must show 'more than a mere possibility of success.'" *Black v. Cincinnati Fin. Corp.*, No. 1:11-cv-2010, 2011 WL 1640962, at *2 (S.D. Ohio May 2, 2011) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir.

---

[4] The Court has reviewed defendants' brief indicating that they did not stipulate to the fact that defendants Thomas and Williams had the power to enforce the special condition. (Doc. 30). However, at this juncture, the Court finds that plaintiff has alleged a sufficient causal connection between his alleged injury and defendants' conduct. *See Cutshall v. Sundquist*, 193 F.3d 466, 471-72 (6th Cir. 1999) (noting that the traceability requirement requires only an "arguable" claim of injuries traceable to the defendant).

2007) (internal quotations omitted)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

"The Constitution protects a parent's right to raise his children." *U.S. v. Widmer*, 785 F.3d 200, 204 (6th Cir. 2015) (citation omitted). "[F]amily life, and the upbringing of children [are] among associational rights [the United States Supreme] Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996). However, the right to family integrity is not absolute. This right must be counterbalanced by the government's compelling interest in protecting minor children. *Widmer*, 785 F.3d at 207 (citing *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006)).

In cases involving review of special conditions of supervised release, the Sixth Circuit has held that, to be valid, the condition must be "reasonably related to the dual goals of [supervised release], the rehabilitation of the defendant and the protection of the public." *Widmer*, 785 F.3d at 204 (quoting *U.S. v. Ritter*, 118 F.3d 502, 504 (6th Cir. 1997)). *See also United States v. Lilley*, No. 15-6415, 2017 WL 7048806, at *9 (6th Cir. July 26, 2017), *cert. denied*, 138 S. Ct. 1301 (2018); *Doe v. Haas*, No. 2:12-cv-188, 2012 WL 1598097, at *6 (S.D. Ohio May 3, 2012). When fundamental rights are implicated, courts must subject special conditions of parole to "careful review, but if primarily designed to meet the ends of rehabilitation and protection of the public, they are generally upheld." *Widmer*, 785 F.3d at 204 (quoting *Ritter*, 118 F.3d at 504 and citing *U.S. v. Zobel*, 696 F.3d 558, 573 (6th Cir. 2012); *U.S. v. Wright*, 529 F. App'x 553, 556 (6th Cir. 2013)). *See also Lilley*, 2017 WL 7048806, at *9. "'[E]ven individual fundamental rights safeguarded by the United States Constitution may be

denied or limited by judicially exacted special conditions of supervised release, as long as those restrictions are directly related to advancing the individual's rehabilitation' and preventing recidivism." *U.S. v. May*, 568 F.3d 597, 608 (6th Cir. 2009). In reviewing special conditions of parole, the Court is tasked with making an "exceedingly fact dependent" decision. *Haas*, 2012 WL 1598097, at *8.

Plaintiff challenges the PRC condition prohibiting unsupervised contact with his son on the grounds that the condition (1) violates his fundamental right to parent his child, (2) violates his fundamental right to live with his spouse, and (3) was implemented without procedural due process. (Doc. 2). Plaintiff cites cases from the Sixth Circuit and other circuits where courts have carefully scrutinized prohibitions on fathers convicted of sex offenses from having contact with their children. (*Id.* at 9-10) (citing *Widmer*, 785 F.3d at 208; *Wright*, 529 F. App'x at 556; *U.S. v. Fey*, 834 F.3d 1 (1st Cir. 2016); *U.S. v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012); *U.S. v. Worley*, 685 F.3d 404 (4th Cir. 2012); *U.S. v. Voelker*, 489 F.3d 139 (3d Cir. 2007); *U.S. v. Davis*, 452 F.3d 991 (8th Cir. 2006)). Plaintiff argues that his PRC condition is "unrelated to the level of risk he poses to his child" because he has never abused his son and his sole sex offense involved an eighteen-year-old female student unrelated to him. (*Id.* at 10-11) (citing *Goings v. Court Svcs. and Offender Supervision*, 786 F. Supp.2d 48 (D.D.C. 2011)). Thus, plaintiff argues that the condition is not narrowly tailored as applied to him and there is no compelling government interest in its enforcement because he has a very low risk of reoffending. (*Id.* at 11).

As an initial matter, the controlling law in the Sixth Circuit requires the Court to consider whether the special condition is "reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public." *Widmer*, 785 F.3d at 204. After carefully reviewing the evidence, including the lay and expert testimony presented at the TRO

hearing, as well as the parties' briefings, the Court concludes that the condition prohibiting plaintiff from unsupervised contact with his son is reasonably related to the state's goals of rehabilitating plaintiff and protecting the public such that plaintiff has not demonstrated a likelihood of success on the merits of his constitutional claim that the condition violates his fundamental right to parent his child.

Defendants presented three key witnesses who testified on how the special condition is reasonably tailored to plaintiff, the nature of his crime, and the goal of rehabilitation and protection of the public.

Tracy Delph, a hearing officer with the Ohio Parole Board under the arm of the Ohio Department of Rehabilitation and Correction since April 2017, is responsible for completing PRC assessments prior to inmate release, conducting violation hearings and probable cause hearings for individuals under supervision or PRC, and reviewing requests to add, modify, or remove Parole Board special conditions. (Transcript at 211-13). Ms. Delph testified that special conditions, such as the no unsupervised contact with minors condition, are imposed when there is a nexus to the crime or an individual's criminal history. (*Id.* at 216-17). Although Ms. Delph did not personally complete plaintiff's PRC assessment, she testified that the special condition was likely imposed due to plaintiff's position of authority over the victim and the sexual relationship with a student who had mental challenges. (*Id.* at 217-18). Even though plaintiff's fourteen-year-old son and his eighteen-year-old female victim fell in different "victim pools," Ms. Delph testified that the special condition is still necessary to not only protect plaintiff's son, but also other minors who associated with his son. (*Id.* at 219-21).

Brigid Slaton, Chief Hearing Officer for the ODRC for ten years, is tasked with overseeing parole violations, supervising staff, and implementing policies, including special

conditions of parole. (Transcript at 238). Ms. Slaton testified that special conditions of parole are individualized and tailored to an offender's criminal history and criminal offense. (*Id.* at 239). She explained that special conditions are imposed prior to an inmate's release by a Parole Board hearing officer based on an assessment that considers information in an offender's file such as the indictment and presentence investigation report. (*Id.* at 243). Ms. Slaton testified that the special condition involving no unsupervised contact with minors, including plaintiff's son, was necessary in plaintiff's case due to the circumstances of the underlying offense, which involved plaintiff's employment as a teacher at the school attended by the victim. (*Id.* at 246). Even though the victim of the offense was eighteen-years-old at the time of the offense, Ms. Slaton testified that the special condition was still necessary due to plaintiff's position of authority at a school. (*Id.*). Ms. Slaton explained that the special condition considered that plaintiff met the victim before she turned eighteen and that the victim had mental health issues. (*Id.* at 246-47). As applied to plaintiff's son, Ms. Slaton, like Ms. Delph, testified that the condition was necessary to protect other minors who associated with his son. (*Id.* at 247). According to Ms. Slaton, plaintiff's low recidivism risk did not eliminate the need to impose the special condition. (*Id.*). Ms. Slaton testified that the special condition allows for offenders to adjust and reacclimate into society post-incarceration as opposed to alternate methods of supervision, such as allowing plaintiff to have unsupervised contact with minors contingent upon occasional polygraph monitoring. (*Id.* at 250).

Richard Brooks, a sex offender specialist for the Adult Parole Authority, is tasked with reviewing sex offender cases and making recommendations to parole officers. (*Id.* at 176). Mr. Brooks testified that the Parole Board imposed the no unsupervised contact with minors condition on a case-by-case basis by "look[ing] at the individual details of each case and

[making] decisions based upon the details of those case[s] with the ultimate goal of protecting the community." (*Id.* at 199). Mr. Brooks testified that the intent of the special condition is to protect the community at large, and that the condition also protects other minors who would associate with plaintiff's son. (*Id.* at 209-10).

Plaintiff argues that the condition is not reasonable as applied to no unsupervised contact with his minor son, whom he has never abused and is at no risk being abused, because his son falls within a different victim pool than the victim of the underlying offense. In this regard, Susan Ullman, a licensed independent social worker with twenty years of experience working with sex offenders, presented expert testimony to dispute the necessity of the special condition as applied to plaintiff's son. Ms. Ullman believes that plaintiff is not a threat to his minor son. In making this determination, Ms. Ullman reviewed plaintiff's medical documents, a letter from plaintiff's wife, material from the criminal trial, a report from Lighthouse Youth Services about the victim, and risk assessment instruments to determine plaintiff's risk to reoffend. (Transcript at 82-83). Ms. Ullman testified that plaintiff scored in the low-risk range on the STABLE sex offender risk assessment instrument. (*Id.* at 95-96). Ms. Ullman recommends that plaintiff be permitted to return to the family home, which would lower his risk to reoffend even further and achieve the best chance of rehabilitation. (*Id.* at 96, 103). Ms. Ullman testified that plaintiff is not a threat to his fourteen-year-old son because his son falls outside of plaintiff's potential victim pool (adult females). (*Id.* at 87). Ms. Ullman concluded that it is "very unusual, especially with that age group (adult females), to cross age and gender victim pools." (*Id.* at 99).

As a whole, the testimony of Ms. Delph, Ms. Slaton, and Mr. Brooks establishes that the special condition of no unsupervised contact with minors—even as applied to plaintiff's son—is reasonable. This testimony establishes that the condition was reasonably related to the nature of

plaintiff's criminal offense. The special condition was imposed in an individualized manner based on plaintiff's position of authority as a special education teacher for a female student with mental health challenges, whom he first met when she was a minor. Plaintiff was in a position of trust, and he betrayed not only the trust of the victim, but the school and community at large as well. The witnesses testified that the special condition serves to protect the public, including other minors who may associate with plaintiff's son, and serves the goal of rehabilitation by giving plaintiff the time he needs to focus on his own rehabilitation and reacclimating into society. Based on this testimony, the Court must recognize and grant a reasonable amount of deference to officials responsible for rehabilitating criminal offenders and keeping the public safe. *Haas*, 2012 WL 1598097, at *9.

Although Ms. Ullman opined that plaintiff is not a risk to his son based on several factors, the Court is persuaded by the testimony of the state's witnesses that the special condition is necessary to not only protect plaintiff's son, but other minors who associate with his son.[5] In addition, plaintiff's low recidivism risk does not eliminate the necessity of the special condition. Further, the state witnesses testified that the fact that plaintiff's son and the victim of the underlying offense were in different victim pools is insignificant for purposes of imposing the special condition.

Plaintiff relies heavily on *Goings*, a case from the U.S. District Court for the District of Columbia, to argue that the condition is not narrowly tailored to the circumstances of his case and underlying offense. In *Goings*, the 23-year-old plaintiff jail corrections officer was convicted of sexual battery for having consensual sex with a 16-year-old inmate. 786 F. Supp.2d

---

[5] Ms. Ullman suggested that maintenance polygraphs, which are administered every six to twelve months, would be a less restrictive alternative to the current condition as applied to Mr. Doe's son. However, the Court finds persuasive Ms. Delph's testimony that polygraph examinations are not an adequate substitute because they reference past behavior, and any additional victimization is not discovered until after the fact. (Transcript at 225).

at 53. The plaintiff was prohibited from having any contact with his children. *Id.* at 54, 57. After noting that plaintiff was a low risk offender and there was no evidence he would offend against his own children, the Court issued injunctive relief and held that there was no basis to support that the parole condition was narrowly tailored or reasonably related to the danger the plaintiff posed to his children "absent additional information supporting the defendant's position that the plaintiff is a danger to his children." *Id.* at 73. Plaintiff argues that like the plaintiff in *Goings*, he poses no risk to his son. (Doc. 26 at 26). Plaintiff also argues that the sexual offense in *Goings* involved a minor whereas the sexual offense in his case involved an eighteen-year-old female student. (*Id.* at 26-27). Defendants identify several factors that distinguish *Goings* from the instant case: the age difference between the plaintiff in this case (46) and his victim (18) at the time of the criminal offense in May 2014; that sixteen years had passed since the *Goings* plaintiff's criminal offense and he had no inappropriate actions with minors in the intervening years; and that the *Goings* plaintiff's children were pre-pubescent and his victim was post-pubescent. (Doc. 25 at 22).

The Court agrees with defendants that *Goings* is not instructive and is factually distinguishable from this case. Here, the underlying offense involved an eighteen-year-old student who suffered from a series of mental health issues, including a low IQ score, post-traumatic stress disorder, reactive attachment disorder, cognitive and memory issues, impaired judgment, and a history of sexual abuse. There was a twenty-eight-year age gap between plaintiff and his victim. Plaintiff served in a position of authority as her special education teacher. Plaintiff was released from prison only a little over a year ago, whereas the plaintiff in *Goings* demonstrated no similar illegal conduct and positive involvement with the community for a period of sixteen years. *See Haas*, 2012 WL 1598097, at *7 (distinguishing *Goings* on

similar grounds). Again, given the testimony presented by defendants' witnesses that plaintiff's low risk of reoffending does not equate to no risk of reoffending against his son (even given the differing victim pools) and that the condition is reasonable to serve the goals of rehabilitation and protection of the public, the Court declines to extend the rationale of *Goings* to the instant case.

Accordingly, because the state has demonstrated that the no unsupervised contact with minors condition was individually tailored to meet ODRC's goals of rehabilitating Mr. Doe and protecting the public, including plaintiff's son and the minors with whom his son may associate, plaintiff has not demonstrated a strong likelihood of success of merits on his constitutional claims.[6]

Finally, the no unsupervised contact with minor condition as applied to plaintiff's son is not absolute. The provision of supervised visits — with plaintiff's wife as the approved supervisor — is a less restrictive condition that allows plaintiff to exercise his right to parent his son while furthering the state's goals of rehabilitation and protection of the public and his minor child. *See Widmer*, 785 F.3d at 210 (White, J., concurring in part and dissenting in part) ("[T]he district court should have considered whether less-restrictive conditions, such as supervised visitation, sufficiently further probation's dual goals of rehabilitation and protection of the public while also assuring some exercise of the parent-child associational rights involved.").

## C. Irreparable Harm

---

[6] Because the Court cannot grant plaintiff the request he seeks at this juncture (i.e. removing the condition as applied to his son and allowing plaintiff to move back into the family home), it is unnecessary for the Court to reach the merits of plaintiff's claims that the condition violates his associational right to live with his wife and violates his procedural due process rights. *See Haas*, 2012 WL 1598097, at *3 ("While the plaintiffs raise important constitutional issues, only the claim that the condition violates Mr. Doe's right to parent his children could result in the relief they request. That is, even if the Court were to find that the condition is unconstitutionally vague, that it violated his associational right to be with his wife or of notice and opportunity to be heard, or that it constituted a taking, but yet found that it did not violate his constitutional right to parent his children, the Court would not immediately place Mr. Doe back in his home.").

Plaintiff must next demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiff alleges that every day that the special condition remains in place, "he loses another opportunity to be a father and husband." (Doc. 26 at 30). Plaintiff testified that the PRC special condition has made him a stranger to his son, and he actually communicated more frequently with his son while he was incarcerated. (Transcript at 33-34). Plaintiff alleges that his son suffers emotionally and academically without plaintiff's care and because plaintiff is unable to live in the family home. (Doc. 2 at 17). Plaintiff testified that the condition prevents him from talking to his son on the phone, sending his son a birthday card, and helping his son with homework. (Transcript at 35, 206-207).

In response, defendants argue that plaintiff cannot establish irreparable harm because the special condition will last only as long as his five-year PRC supervision, of which plaintiff has already served one year, and may be subject to a lesser term than five-years. (Doc. 25 at 24) (citing Ohio Admin. Code § 5120:1-1-41(H)). Defendants also argue that the APA's sex offender reunification policy provides that the condition of no unsupervised contact with minors, as applied to an offender's family member, may be removed after seven conditions are met. (*Id.* at 24-25) (Plaintiff's Exhibit 4 at 11). Defendants contend that the evidence demonstrates that parole officials frequently worked with plaintiff to allow visits with his son and have consistently reached out to plaintiff's family members to facilitate these visits. (*Id.* at 27).

The Court is unable to conclude that plaintiff has met his burden of showing he will suffer actual and imminent harm if a temporary restraining order is not granted. As the evidence demonstrates, since plaintiff has been under PRC supervision for over one year, he is eligible to

have the special condition as applied to no unsupervised contact with his son removed under the APA reunification process. As defendants argue, the reunification process is not so onerous as to cause irreparable harm, especially given that plaintiff has been on supervision for over one year, he received a low risk score on the Static-99R, and he has not committed any violations involving high risk sexual behavior, and he has therefore satisfied the first five steps of the process. The testimony given by Mr. Brooks and Ms. Slaton demonstrates that removal of the condition would likely not cause any undue delay at steps six and seven of the reunification process. Mr. Brooks, the sex offender specialist, testified that plaintiff poses a low risk of harm to his son, and Ms. Slaton testified that the Office of Victim's Services is very responsive. (Transcript at 205, 260).

Plaintiff contends that the family reunification process is unnecessary, given Ms. Ullman's testimony that plaintiff and his family were never "un-unified." (Doc. 26 at 17). Plaintiff also argues that Mr. Brooks testified that the family reunification process can take longer than a year. (*Id.* at 13). However, plaintiff's evidence of harm does not rise to the level of harm that is "actual and imminent" rather than "harm that is speculative or unsubstantiated." *Planned Parenthood Sw. Ohio Region v. Hodges*, 138 F. Supp.3d 948, 960 (S.D. Ohio 2015) (quoting *Abney*, 443 F.3d at 552). While the Court is certainly sympathetic to plaintiff's immediate desire to move back into the family home and maintain an unrestricted relationship with his son, plaintiff is presently allowed to have supervised visitation with his son. Mr. Brooks testified that he has never denied any of plaintiff's requests for supervised contact with his son. (Transcript at 208). Ms. Bassett, plaintiff's parole officer, denied one request for plaintiff to attend a family picnic where other minor children besides plaintiff's son were present, but when Mrs. Doe modified the plan to hold the dinner at home with the son as the only minor present,

that request was approved. (Defendants' Exhibit 1 at 1). Most recently, the APA approved plaintiff's wife as a supervising adult who can supervise visits with their son. (Transcript at 183). Defendants have demonstrated that the condition is not permanent and will likely be removed in the near future upon plaintiff's compliance with parole conditions and the family reunification process.

Moreover, even if the Court were to agree that plaintiff would suffer irreparable harm in the absence of injunctive relief, injunctive relief is not warranted on this basis alone because the Court has already found that plaintiff has not shown a strong likelihood of success on the merits on his claims. *See Gonzales*, 225 F.3d at 625; *Haas*, 2012 WL 1598097, at *9.`

### D. Harm to Others and Public Interest

The Court concludes that the remaining two factors weigh in favor of defendants. The Adult Parole Authority has the statutory authority to impose conditions of supervision once an offender begins PRC supervision. Ohio Rev. Code. § 2967.28(C). Issuing a TRO and enjoining defendants from enforcing the special condition as applied to plaintiff's son would undermine the Parole Authority's critical role in imposing parole conditions on offenders to best serve the goals of rehabilitation and public safety, which would not serve the public interest. Plaintiff is correct that there is a strong public interest in the protection of constitutional rights (Doc. 2 at 18); however, he has failed to demonstrate a substantial likelihood of success on the merits on these claims. Accordingly, plaintiff cannot show that a TRO would not result in harm to others or that it would serve the public interest.

### IV. Conclusion

Upon consideration of the above factors for injunctive relief, the Court finds that plaintiff has not demonstrated a substantial likelihood of success on the merits of his constitutional

claims. The Court also finds that plaintiff has not demonstrated irreparable harm that is "imminent." In addition, the "harm to others" and "public interest" factors weigh against the issuance of a TRO. Accordingly, plaintiff's motion for a temporary restraining order (Doc. 2) should be **DENIED**.

**IT IS SO RECOMMENDED.**

Date: _____1/31/19_____                    s/ Karen L. Litkovitz_____
                                                Karen L. Litkovitz
                                                United States Magistrate Judge

JOHN DOE,
    Plaintiff,

    vs.

DENISA BASSETT, et al.,
    Defendants.

Case No: 1:18-cv-508

Barrett, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).